# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00549-COA

S.Z.O.                                                                              APPELLANT

v.

HARRISON COUNTY DEPARTMENT OF CHILD                         APPELLEES
PROTECTION SERVICES, BY MARCUS D.
DAVENPORT, AND M.A.B., A MINOR, BY AND
THROUGH HER NEXT FRIEND, MARCUS D.
DAVENPORT

DATE OF JUDGMENT:                    04/11/2023
TRIAL JUDGE:                         HON. MICHAEL BRYAN DICKINSON
COURT FROM WHICH APPEALED:           HARRISON COUNTY YOUTH COURT
ATTORNEY FOR APPELLANT:              JAMES L. FARRIOR III
ATTORNEYS FOR APPELLEES:             KRISTI DUNCAN KENNEDY
                                     VICTORIA ANN LOWERY
                                     KIMBERLY MICHELLE HENRY
                                     WENDY MOORE SHELTON
                                     CHELYE P. AMIS
NATURE OF THE CASE:                  CIVIL - CUSTODY
DISPOSITION:                         AFFIRMED - 11/26/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    S.Z.O. appeals the judgment of the Harrison County Youth Court terminating her

parental rights to her daughter, M.A.B.[1] On appeal, S.Z.O. asserts that the youth court erred

when it found that clear and convincing evidence supported termination of her parental rights

(TPR) pursuant to Mississippi Code Annotated sections 93-15-115, 93-15-119, and

---

[1] We refer to the child and the family members by their initials to protect the child's
privacy and anonymity.

93-15-121 (Rev. 2021) and that termination was in M.A.B.'s best interest. Because we find that the record contains sufficient credible proof to support the youth court's judgment, we affirm the termination of S.Z.O.'s parental rights.[2]

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I. Circumstances Leading to M.A.B. Being Taken into CPS Custody

¶2. M.A.B. was born in Harrison County in August 2020. Her biological mother is S.Z.O., and her biological father is E.K.B. She and M.A.B. lived with E.K.B. and S.Z.O.'s mother (A.D.) and father. On January 9, 2021, M.A.B. became unresponsive for approximately thirty minutes after E.K.B. gave her a bottle. S.Z.O. was away from the home, and A.D. was babysitting M.A.B. M.A.B. was four months old at the time of the incident.

¶3. Police, fire, and paramedics responded to the 911 call. Responding officer Ronald Radix of the Biloxi Police Department (Biloxi PD) reported that A.D. told him "she had two pieces of crack cocaine on her dresser earlier in the day that came up missing," and she believed the baby formula E.K.B. had prepared that evening contained the crack rocks. A.D. believed E.K.B. put the crack rocks in M.A.B.'s bottle.

¶4. The paramedics transported M.A.B. to Merit Health Biloxi Emergency Department (Merit Health) to receive a medical evaluation and treatment. There, S.Z.O. cursed and was verbally aggressive toward the hospital staff. She also attempted to leave with M.A.B. against medical advice. This attempt prompted hospital staff to call the police. Responding officer

---

[2] This case concerns the youth court's termination of S.Z.O.'s parental rights to M.A.B. The child's biological father, E.K.B., did not appeal from the youth court's judgment that also terminated his parental rights to M.A.B.

2

Vicki Lee was able to calm S.Z.O.

¶5.     M.A.B.'s bloodwork came back positive for cocaine.  Hospital staff called the Harrison County Department of Child Protection Services (CPS) and discharged M.A.B. from the hospital to go home with S.Z.O.  A CPS social worker followed S.Z.O. and M.A.B. to conduct a home inspection.  During the home inspection, E.K.B., who also lived in the home with S.Z.O. and M.A.B., admitted to the CPS social worker that he would test positive for marijuana.

¶6.     S.Z.O. and E.K.B. had a second child, K.B., who was born in October 2021.

## II.     Youth Court Proceedings Prior to the TPR Hearing

¶7.     On January 10, 2021, the youth court entered an emergency custody order placing M.A.B. in CPS custody.  The next day, S.Z.O. submitted a hair follicle test. It was positive for cocaine.  The youth court held a shelter hearing the same day and entered a shelter order finding that it was in M.A.B.'s best interest to remain in CPS's custody.  The court further ordered CPS to make reasonable efforts for reunification. Also on the same day, CPS filed a petition to have M.A.B. adjudicated a neglected child.  S.Z.O. and E.K.B. initially denied the allegations in the petition.

¶8.     On March 9, 2021, the youth court held an adjudication hearing.  S.Z.O. and E.K.B. changed their denials to pleas of no contest to the allegation that M.A.B. became a "neglected child" on January 9, 2021.  The youth court entered an order adjudicating M.A.B. as a "[n]eglected child" as defined by Mississippi Code Annotated section 43-21-105(l) (Supp. 2019).  On that same date, the youth court entered a disposition order setting a permanency

plan of reunification and a concurrent plan of custody with a relative ("March 9, 2021 disposition order"). The youth court further ordered S.Z.O. to enter into a service agreement with CPS and for S.Z.O. to

> obtain and maintain stable housing with all working utilities, obtain and maintain stable employment with verifiable income, obtain a valid driver's license, obtain reliable transportation with insurance, participate and cooperate with In[-]Circle, attend and successfully complete parenting classes through In[-]Circle, undergo an assessment with FIP [(Family Intervention Program)], if not accepted in FIP undergo a drug assessment and follow all recommendations, submit to random drug screens as directed, maintain visitation with said minor child, fully comply with CASA [(Court Appointed Special Advocates)], fully comply with MDCPS [(Mississippi Department of Child Protection Services)], maintain contact with CASA and MDCPS, and provide a working telephone number at all times.

¶9. The record contains the results of S.Z.O.'s random drug screening tests from January 11, 2021, to March 31, 2023, as required by the March 9, 2021 disposition order. Out of forty-four drug tests, S.Z.O. tested positive for drugs on five occasions. On two occasions, S.Z.O. was considered a "no show," and the remaining drug screens revealed negative results.

¶10. With respect to the positive drug tests, S.Z.O. tested positive for cocaine on January 11, 2021 (just two days after M.A.B.'s medical emergency that resulted in M.A.B. being taken into CPS's custody); July 23, 2021; and March 23, 2023 (just two weeks before the TPR hearing).[3] S.Z.O. tested positive for marijuana on June 13, 2022, and she tested positive for "THC Metabolite" on August 5, 2022.

---

[3] Shortly before the TPR hearing, S.Z.O. submitted a clean hair follicle drug screen to CPS, which was taken on March 31, 2023 (five days before the April 5, 2023 TPR hearing).

4

¶11.    The March 9, 2021 disposition order also required that S.Z.O. undergo an assessment for participation in the family intervention program.[4] On June 24, 2021, the youth court held a family-intervention-program hearing and found that S.Z.O. was initially denied the opportunity to participate in the program because she was not present for her initial intake appointment. The court ordered S.Z.O. to participate in the program.

¶12.    Three months later, however, on September 30, 2021, the youth court once again found that S.Z.O. was noncompliant with the program because the court had been unable to contact her.  S.Z.O. was once again ordered to participate in the program.  In its November 18, 2021 order, the youth court specifically directed that both S.Z.O. and E.K.B. "shall attend the Family Intervention Court Program until successfully completed."

¶13.    At a family-intervention-program hearing on December 8, 2021, the youth court found that S.Z.O. was only in partial compliance with the program because she had failed to attend narcotics-anonymous or alcoholics-anonymous (NA/AA) meetings.  S.Z.O. was again ordered to continue participation in the family intervention program "until successfully discharged."  On January 6, 2022, the youth court found that S.Z.O. was only in partial compliance with the family intervention program because she had missed therapy appointments and a support meeting. Again, S.Z.O. was ordered to continue participating in

---

[4] The Harrison County Family Intervention Program "works in conjunction with abuse and neglect cases where substance use disorders are a contributing factor leading to the abuse or neglect of children."  Harrison County Board of Supervisors, Mississippi, *Family Intervention Program* (2022), https://harrisoncountyms.gov/departments/courts/youth_court/family_intervention_program.php.

the program until she successfully completed it.[5]  Finally, on January 20, 2022, the youth court found that S.Z.O. was noncompliant with the requirements of the family intervention program and dismissed her from the program as "unsuccessful[]."  S.Z.O. subsequently obtained a drug assessment at Crossroads Recovery Center (Crossroads).  According to CPS supervisor Mary Louise Castello, the assessment "indicated that [S.Z.O.] didn't need treatment."

¶14.    The youth court also directed S.Z.O. to participate in the In-Circle program[6] pursuant to its March 9, 2021 disposition order.  Although S.Z.O. participated in that program from March 15, 2021, through August 25, 2021, she became noncompliant with the In-Circle program on August 30, 2021.  The record contains a certificate showing that S.Z.O. completed an "active parenting curriculum" as part of the program, but there is no indication in the record that S.Z.O. successfully participated in and completed the In-Circle program in full.

¶15.    On March 21, 2022, the youth court held a permanency hearing.  At this hearing, the youth court found that S.Z.O. was noncompliant with the service agreement and that CPS had made reasonable efforts to assist S.Z.O. and E.K.B. with reunification and in complying with

---

[5] In contrast, the youth court ordered E.K.B. to seek more intense treatment because he "continue[d] to test positive on his drug screens."  The youth court ordered: "[T]herefore, [E.K.B.] shall attend a thirty . . . day in-patient program for a higher level of care and . . . he must complete the in-patient paperwork this date before leaving the [c]ourt."

[6] "[In-Circle] is an intensive, home and community-based family preservation, reunification, and support services program for families with children at risk of out-of-home placement."  Mississippi Department of Child Protection Services, *Prevention Resources* (2024), https://www.mdcps.ms.gov/programs/child-abuse-prevention/prevention-resources.

the service agreement. The court further found that reunification was not in M.A.B.'s best interest.

¶16. The youth court ordered CPS to change the permanency plan of reunification to a permanency plan of adoption. The court further ordered the concurrent plan of custody with a relative changed to a concurrent plan of durable legal custody or guardianship.

¶17. On October 24, 2022, CPS filed a petition to terminate S.Z.O.'s and E.K.B.'s parental rights. The next day, the youth court appointed Ann Clark Lazzara as M.A.B.'s guardian ad litem (GAL).

### III. April 5, 2023 TPR Hearing

¶18. The youth court held an evidentiary hearing on CPS's petition to terminate S.Z.O.'s parental rights on April 5, 2023. Counsel for CPS, counsel for S.Z.O., and Lazzara, the GAL for M.A.B., were present at the hearing. Also present were Crystal Butterworth, a special advocate for M.A.B. assigned through the CASA program, and M.A.B.'s foster parents.

¶19. S.Z.O.; S.Z.O.'s sister J.O.; Mary Louise Castello, the CPS supervisor assigned to M.A.B.'s case; and Stacey Todd, the current caseworker, were present and testified at the hearing.

¶20. Forty-five exhibits were admitted into evidence at the hearing, including the orders and pleadings from the youth court proceedings prior to the TPR hearing; the medical records and police reports pertaining to M.A.B.'s January 9, 2021 medical emergency; an "active parenting curriculum" certificate issued to S.Z.O. on July 28, 2022; two letters from an In-Circle program coordinator regarding S.Z.O.'s participation in that program; one wage form

7

for S.Z.O. from "Clark Oil Company"; a "Heart2Heart Homecare Services Record of Contact Log" for S.Z.O. from February 15, 2023, through March 8, 2023; S.Z.O.'s drug screen results from January 11, 2021, through March 23, 2023; the GAL's report; a panel hair follicle drug test on S.Z.O. taken March 31, 2023; and a "settlement accounting" statement indicating that S.Z.O. received a settlement for approximately $134,000 just before the TPR hearing.

¶21. The youth court heard testimony and evidence about S.Z.O.'s living conditions, employment, S.Z.O.'s family-intervention-program participation, her drug screens, and the relationship between S.Z.O. and M.A.B. These issues were CPS's central concerns that were preventing reunification.

### A. S.Z.O.'s Living Conditions

¶22. Both Castello and Stacey testified that S.Z.O.'s unstable living situation was one of CPS's principal concerns. Although S.Z.O.'s testimony on this point was confusing, her testimony, combined with documentary evidence and testimony from Castello and Stacey, showed that S.Z.O. lived in several locations from the time M.A.B. was taken into CPS custody. At the time of M.A.B.'s medical emergency, S.Z.O. and M.A.B. were living with E.K.B., A.D., and S.Z.O.'s father at 242 Keller Avenue. S.Z.O. left that address around October 2021. From Keller Avenue, S.Z.O. and E.K.B. moved in with S.Z.O.'s grandmother on Elmira Drive in Biloxi. S.Z.O. left Elmira Drive and moved to Jefferson Street in December 2021 and lived there for five to six months. She then moved from Jefferson Street to Prudie Circle in Gulfport. S.Z.O. lived there with her infant son K.B. and her father. For some period of time, S.Z.O.'s sister J.O. also lived there. S.Z.O. remained there about six

8

to seven months.

¶23.   Stacey testified that when she was trying to arrange her first home visit with S.Z.O. in February 2023, she asked S.Z.O. for her address.[7]  S.Z.O. gave her two addresses: Elmira Drive and Prudie Circle.  Stacey testified that S.Z.O. told her she would stay three to four days at one address and three to four days at the other.  Castello corroborated Stacey's testimony on this point.

¶24.   Both S.Z.O. and Stacey testified about a walkthrough at Prudie Circle. S.Z.O. confirmed that she refused the February 27, 2023 walkthrough because the house was dirty. She also confirmed the March 10 walkthrough took place.  S.Z.O. said that Stacey told her the apartment was unsuitable for M.A.B.  Stacey, however, testified that she conducted the walkthrough and found no issues with the home.  She testified that she did not tell S.Z.O. that she needed to find a new place.  Stacey testified that she reiterated to S.Z.O. during the home visit that S.Z.O.'s consistency, including her staying in one place, continued to be CPS's biggest concern.

¶25.   The day before the TPR hearing, S.Z.O. signed a lease on a new apartment.  She could not remember the address but said that it was located in Biloxi and had two bedrooms and two bathrooms.  S.Z.O. testified that if she retained custody of M.A.B., M.A.B. could have her own room.

### B.    S.Z.O.'s Employment History, Income, and Means of Transportation

¶26.   S.Z.O. testified that about two to three months before the TPR hearing, she began

---

[7] Stacey had recently been assigned as S.Z.O.'s caseworker.

working as a home health aide at Heart2Heart Home Healthcare. A "Heart2Heart Homecare Services Record of Contact Log" for S.Z.O. was admitted into evidence. The log indicated that S.Z.O. worked four hours a day for approximately two to three days a week from February 15, 2023, through March 8, 2023. The record contains no evidence of S.Z.O.'s earnings with respect to this job. S.Z.O. said that before working with the home healthcare service, she worked at a Waffle House restaurant and a Shell gas station. The record contains no evidence establishing the dates of employment at these entities.

¶27. Regarding income, just one wage form from "Clark Oil Company" was admitted into evidence, and the record contains no testimony about S.Z.O.'s earnings. The Clark Oil Company wage form shows gross pay totaling $856.19, but the form is not dated. Regarding other monetary sources, S.Z.O. testified that she had received a settlement of about $134,000 just before the TPR hearing. She provided the settlement accounting statement to CPS two days before the hearing, and that statement was admitted into evidence at the hearing.

¶28. As for S.Z.O.'s means of transportation, S.Z.O. admitted that she did not have a vehicle at the time of the hearing. She testified that either her sister takes her to work, or she takes public transportation. S.Z.O. also testified, however, that she was "kicked out of the [family intervention] program" because she missed support meetings. She explained, "I didn't have a car, you know."

### C. S.Z.O.'s Participation in the Family Intervention Program and Drug Tests

¶29. The witnesses' testimonies and the youth court orders and pleadings admitted into evidence reflect that S.Z.O. did not successfully complete the family intervention program.

10

S.Z.O. testified that she was going to court three times per week to take drug tests, but, as noted above, S.Z.O. claims she was "kicked out" of the program because she did not attend meetings due to her lack of transportation.

¶30.    S.Z.O. testified that she obtained a drug assessment at Crossroads and that Crossroads determined she did not need drug treatment. Castello testified that S.Z.O. provided CPS with a May 2022 assessment from Crossroads two days before the TPR hearing "[that] indicated that [S.Z.O.] didn't need treatment." No documentation of this assessment is in the record.

¶31.    Although Castello acknowledged the Crossroads May 2022 assessment, Castello explicitly testified that what she found concerning was S.Z.O.'s more recent positive drug test result for cocaine. In particular, the record reflects that S.Z.O. tested positive for cocaine at her last drug screen with the family intervention program on March 23, 2023, just two weeks before the TPR hearing. S.Z.O. testified that she then paid for her own instant drug screen, and the result was negative. The documentation for this drug test was admitted into evidence and shows that the test was taken on March 31, 2023.

### D.    S.Z.O.'s Visitation with M.A.B. and Contact with CPS

¶32.    Regarding S.Z.O.'s visitation with M.A.B., S.Z.O. said she was "seeing M.A.B. often" until December 2022. Her visits with M.A.B. stopped in December 2022 because K.B. was diagnosed with epilepsy. S.Z.O. testified that most of her time after that was spent taking K.B. back and forth to the children's hospital in Mobile, Alabama.

¶33.    S.Z.O. admitted that she did not reach out to M.A.B.'s foster parents for visitation, and she did not contact anyone at CPS to arrange for visitation with M.A.B. She testified

11

that she was at the hospital with K.B. when CPS contacted her to set up a visit with M.A.B. According to S.Z.O., she understood that CPS would contact her again to reschedule her visit, but she did not hear from them. She admitted that she herself never called CPS back to reschedule the visit. According to S.Z.O., she did not know whom to contact for the visits because new caseworkers were constantly being assigned. S.Z.O. said she had phone contact with M.A.B. through FaceTime, but she acknowledged the difficulty in interacting with the toddler during these calls.

¶34. S.Z.O. testified that she is providing food, shelter, and clothing for her one-year-old child K.B. and she can do the same thing for M.A.B. Castello testified that there had been "a positive drug screen for cocaine" for K.B., however, and CPS has had an open case on K.B. since he was born in October 2021.

¶35. Castello testified that S.Z.O.'s lack of contact with M.A.B. affected her relationship with M.A.B. Castello further confirmed that S.Z.O.'s actions had risen to the level of eroding the relationship between her and M.A.B. Additionally, Castello confirmed that she believed S.Z.O. was not "fit to . . . regain custody of M.A.B." and that the termination of S.Z.O.'s parental rights was in M.A.B.'s best interest. Castello further confirmed that M.A.B.'s current placement with her foster parents was in M.A.B.'s best interest.

¶36. S.Z.O.'s sister J.O. testified that she did not believe a bond existed between S.Z.O. and M.A.B., but J.O. knew that S.Z.O. "wants it." Based on J.O.'s observations, there was no bond between M.A.B. and S.Z.O. because the only communication S.Z.O. had been having with M.A.B. was by telephone.

12

### E. The GAL's Report

¶37. The GAL's report was admitted into evidence at the TPR hearing. The GAL was present at the hearing, but she did not testify. In her report, the GAL delineated the grounds for termination of parental rights as stated in the TPR petition, these being the allegations she was tasked to investigate. The GAL "conferred with the Harrison County [CPS] and reviewed the court file as well as information provided to [her] by CPS." She also met with M.A.B. and her licensed foster parents at their home in Biloxi on March 29, 2023.

¶38. M.A.B. had lived with her foster parents since she was four months old. She was two years and seven months old at the time of the hearing. The GAL described M.A.B. as "friendly[,] . . . affectionate, . . . outgoing[,] and self-assured" and found that "[M.A.B.] is clearly well-loved, happy[,] and content in her foster home." The GAL opined that she "believes that it is in the best interest of [M.A.B.] that the parental rights of [S.Z.O. and E.K.B.] be terminated so that a permanent and stable plan for the future of [M.A.B.] may be made and so that [M.A.B.] will be eligible for adoption." Additional details regarding the GAL's findings are discussed below.

¶39. At the close of the evidence, the youth court heard closing arguments from counsel for CPS and for S.Z.O. The youth court judge informed counsel that he would take the matter under advisement.

### IV. The Youth Court's Judgment for Termination of Parental Rights

¶40. On April 22, 2023, after "having considered the pleadings, evidence[,] and testimony given in open [c]ourt," the youth court issued its judgment terminating S.Z.O. and E.K.B.'s

13

parental rights pursuant to Mississippi Code Annotated sections 93-15-115, 93-15-119, and 93-15-121. The youth court found that Lazzara had been appointed as GAL for M.A.B. in accordance with the applicable statutory provisions. Having reviewed the GAL report, the youth court found that the GAL was "experienced and qualified" and "did a thorough independent investigation."

¶41. The youth court found that M.A.B. was born in August 2020; Harrison County CPS had taken custody of M.A.B. on January 10, 2021, pursuant to a court order; M.A.B. had been in CPS custody for at least six months prior to the TPR hearing; and M.A.B. had been adjudicated as neglected on March 9, 2021, by a court order. Additionally, the youth court found that CPS had made "reasonable efforts over a reasonable period of time" to assist S.Z.O. and E.K.B. in complying with the terms of their reunification service plans, but neither S.Z.O. nor E.K.B. had substantially complied with the plans.

¶42. In relevant part and specifically with respect to S.Z.O., the youth court found that she was "unfit" to raise M.A.B. pursuant to section 93-15-119(1)(a)(i) and that reunification of M.A.B. and S.Z.O. was not in M.A.B.'s best interest and "not desirable toward obtaining a satisfactory permanency outcome" pursuant to section 93-15-119(1)(a)(ii). The youth court also found that S.Z.O.'s neglectful conduct "caused, at least in part, an extreme and deep-seated antipathy" between S.Z.O. and M.A.B. "or some other substantial erosion of the relationship between the parent and child," thus finding that this conduct constituted another ground for termination of S.Z.O.'s parental rights pursuant to section 93-15-121(f). The youth court also found that S.Z.O. was "suffering from habitual alcoholism or other drug

14

addiction" and "failed to successfully complete alcohol and/or drug treatment constituting grounds for termination of [her] parental rights pursuant to . . . [s]ection 93-15-121(c)"; further, the court found that S.Z.O. "failed to exercise reasonable visitation or communication with the child constituting grounds for termination of [her] parental rights pursuant to . . . [s]ection 93-15-121(e)."

¶43. Finally, the youth court found "by clear and convincing evidence that it is in the best interests of [M.A.B.] that the parental rights of [S.Z.O. and E.K.B.] be terminated so that a permanent and stable plan for the future of [M.A.B.] may be made and so that [M.A.B.] will be eligible for adoption." Accordingly, the youth court ordered that E.K.B. and S.Z.O.'s parental rights be terminated and that CPS be awarded "full care and custody" of M.A.B. with "authority to enter a consent for the adoption of [M.A.B.]"

¶44. S.Z.O. appeals.

## STANDARD OF REVIEW

¶45. The youth court's "findings of fact are viewed under the manifest error/substantial credible evidence test." *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs.*, 373 So. 3d 985, 987 (¶8) (Miss. 2023) (internal quotation mark omitted). In complying with this standard, "this Court asks not how it would have decided the case *ab initio* but whether credible proof exists to support the judge's findings of fact by clear and convincing evidence." *Id.* (internal quotation marks and ellipses omitted). In short, we must "give[] deference to the youth court's findings of fact." *Id.* (internal quotation mark omitted). "Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion,

15

we are still bound by the [youth court's] findings unless manifestly wrong." *Id.* at (¶8).

## DISCUSSION

## Termination of S.Z.O.'s Parental Rights

¶46. S.Z.O. asserts that the youth court erred when it terminated her parental rights because "she was in substantial compliance with the [youth] court's orders, had submitted numerous clean drug test results over a period of about [two] years, had suitable housing, [was] maintain[ing] gainful employment[,] and had been visiting with her child as allowed by the [youth] [c]ourt." We are unpersuaded by S.Z.O.'s contentions. We affirm the youth court's termination of S.Z.O.'s parental rights for the reasons addressed below.

¶47. The TPR hearing was held on April 5, 2023. At the outset of the hearing, the youth court judge specifically announced that "[t]he standard of proof required for terminating parental rights is clear and convincing evidence." S.Z.O., Castello, Stacey, and J.O. testified at the hearing, and forty-five exhibits were admitted into evidence, as described above.

¶48. On April 11, 2023, after "having considered the pleadings, evidence[,] and testimony given in open [c]ourt," the youth court issued its judgment terminating E.K.B.'s and S.Z.O.'s parental rights pursuant to Mississippi Code Annotated sections 93-15-115, 93-15-119, and 93-15-121. We discuss these grounds as they pertain to S.Z.O. below.

### I.    Section 93-15-115

¶49. Section 93-15-115 applies to any involuntary termination of parental rights where, as here, reasonable efforts are required for reunification of a child in CPS custody. The youth court was authorized to terminate S.Z.O.'s parental rights "if, after conducting an evidentiary

16

hearing, the court finds by clear and convincing evidence that" the following four conditions are met:

> (a) The child has been adjudicated abused or neglected;
>
> (b) The child has been in the custody and care of, or under the supervision of, the [MDCPS] for at least six (6) months, and, in that time period, the [MDCPS] has developed a service plan for the reunification of the parent and the child;
>
> (c) A permanency hearing, or a permanency review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that the [MDCPS], or a licensed child caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and
>
> (d) Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

Miss. Code Ann. § 93-15-115.

¶50.	Upon review, we find that the record contains credible proof that the youth court's findings on paragraphs (a) through (d) of section 93-15-115 are supported by clear and convincing evidence.

### A.	First Three Requirements of Section 93-15-115 (Miss. Code Ann. § 93-15-115(a) through (c))

¶51.	Regarding section 93-15-115(a), CPS presented uncontroverted evidence at the TPR hearing that it petitioned the youth court on January 12, 2021, requesting that M.A.B. be adjudicated a "neglected child" based upon the circumstances surrounding M.A.B.'s medical

episode and the child's positive drug test for cocaine on January 10, 2021, as described above. S.Z.O. and E.K.B. pleaded no contest to the petition seeking to have M.A.B. adjudicated a "neglected child." The youth court entered an order on that same date adjudicating M.A.B. a "neglected child" pursuant to section 43-21-105(l).

¶52. With respect to section 93-15-115(b), it is not disputed that M.A.B. had been in CPS's custody for more than six months. M.A.B. entered CPS's custody on January 10, 2021—more than two years before the TPR hearing.

¶53. Regarding section 93-15-115(c), CPS presented uncontroverted evidence at the TPR hearing that the youth court held a permanency hearing on March 21, 2022, and entered a permanency order on the same day. The March 21, 2022 permanency order concluded that (1) CPS had made reasonable efforts in a reasonable time period to assist S.Z.O. in complying with the reunification service plan, (2) S.Z.O. had not substantially complied with the terms and conditions of the service plan, and (3) reunification was not in the best interest of M.A.B. Because the youth court previously ruled on these issues, it was not obligated to readdress these issues during the TPR hearing. *See R.B. v. Winston Cnty. Dep't of Child Prot. Servs.*, 291 So. 3d 1116, 1121-22 (¶¶13-15) (Miss. Ct. App. 2019). Indeed, because S.Z.O. did not appeal the youth court's March 21, 2022 permanency order, she is now barred from doing so. *Bullock v. Miss . Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1087-88 (¶29) (Miss. Ct. App. 2022) (recognizing that where the biological mother never appealed the youth court's adjudication order, "this Court has no jurisdiction over any issues stemming

from the [that] order"); *M.A.S.*, 353 So. 3d at 476 (¶42).[8]

### B. Fourth Requirement of Section 93-15-115 (Miss. Code Ann. § 93-15-115(d))

¶54. Section 93-15-115(d) requires the youth court to find that the involuntary termination of parental rights "is appropriate because reunification . . . is not desirable toward obtaining a satisfactory permanency outcome based *on one or more of the grounds* set out in Section 93-15-119 *or* 93-15-121." (Emphasis added). This statutory provision plainly provides that only one statutory ground under either section 93-15-119 or section 93-15-121 is necessary to terminate parental rights. *Id.*; *see M.A.S.*, 353 So. 3d at 481 (¶64). Among other grounds, the youth court in this case found that there was clear and convincing evidence to terminate S.Z.O.'s parental rights pursuant to section 93-15-119. We find no error in the youth court's finding on this ground for the reasons addressed below.

### II. Section 93-15-119

¶55. In relevant part, section 93-15-119 authorizes a court to terminate the parental rights of a parent as follows:

---

[8] Effective July 1, 2024, the Mississippi Legislature amended the statute regarding appeals in youth court cases. The statute now states as follows:

> All factual findings, legal determinations, and adjudication of issues by the youth court prior to the time the final order is entered are preserved for appellate review and any common law to the contrary is expressly abrogated. Any matters adjudicated by the youth court through interim orders such as adjudication/disposition orders, or permanency review orders, may be only appealed through the interlocutory appeal process provided by the Rules of Appellate Procedure.

Miss. Code Ann. § 43-21-651 (Supp. 2024).

(1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:

> (a)(i) That the parent . . . is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and
>
> (ii) That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome . . . .

Miss. Code Ann. § 93-15-119(1)(a)(i)-(ii).

¶56.   As discussed below, we find that the record contains credible proof that the youth court's findings that S.Z.O. was "unfit" to raise M.A.B. and that reunification would not lead to a satisfactory permanency outcome were supported by clear and convincing evidence.

### A.   M.A.B.'s January 9, 2021 Medical Emergency and the Surrounding Circumstances

¶57.   Section 93-15-119(1)(a)(i) provides that whether a parent is "unfit" can be established by a parent's "past *or* present conduct" demonstrating "a substantial risk of compromising or endangering the child's safety and welfare."  (Emphasis added).  In this case, the testimony and evidence presented at the TPR hearing show that S.Z.O. knowingly allowed M.A.B. to live in a home where she was exposed to drug use and cared for by drug users, S.Z.O. attempted to prevent M.A.B. from receiving necessary medical treatment on January 9, 2021, and S.Z.O. herself tested positive for cocaine just two days after M.A.B. was placed in CPS's custody—and again just two weeks before the TPR hearing.

20

¶58. As described above, on January 9, 2021, M.A.B. needed emergency medical care and tested positive for cocaine. M.A.B. was four months old at the time. According to the BPD incident report and the Merit Health nurse's notes, while M.A.B. was getting treatment at the hospital, S.Z.O. became disruptive and "verbally aggressive" toward the nurses and attempted to leave the hospital with M.A.B. against medical advice.

¶59. Other credible proof shows that S.Z.O. allowed her infant child to live in a home where she knew the child would be exposed to drugs. In particular, at the time M.A.B. tested positive for cocaine, S.Z.O. and M.A.B. were living with E.K.B., A.D. (S.Z.O.'s mother), and S.Z.O.'s father. S.Z.O. testified at the TPR hearing that "[she] was aware that [her] mother [(A.D.)] had a problem with drugs," specifically, "cocaine." As reflected in the Merit Health nurse's notes and the BPD incident report, S.Z.O. told the nurse and the investigator that her mother was a "crackhead" and stated, "Once a dope head, always a dope head." Officer Radix, who responded to the January 9, 2021 911 call, reported that A.D. admitted to him that she kept crack rocks on her dresser. E.K.B. (also a resident of the household) admitted to CPS during their home inspection following the incident that he would test positive for marijuana.

¶60. Despite her knowledge of the drug use and the presence of drugs in her home, S.Z.O. continued to allow M.A.B. to live with A.D. and E.K.B. and for them to care for M.A.B. We note the contrast between S.Z.O.'s decision to remain in her mother's home and her sister's decision on this issue. J.O. testified that when she was faced with a similar situation (i.e., knowing the potential that her children would be exposed to drugs in her mother's home),

21

"unlike [S.Z.O.], . . . I moved out. I moved out for the protection of my children."

¶61. We find that this evidence of S.Z.O.'s conduct—allowing M.A.B. to live in a home where drug use was prevalent and attempting to prevent M.A.B. from getting medical treatment due to the drug exposure—is credible proof supporting the youth's court's finding by clear and convincing evidence that S.Z.O. endangered and compromised M.A.B.'s welfare and safety and, thus, was "unfit" to raise M.A.B.

### B. Failure to Comply with Service Plan

¶62. Further evidence that S.Z.O. was "unfit" and that reunification would not lead to a satisfactory permanency outcome was S.Z.O.'s repeated failure to comply with the reunification service plan and youth court orders. Specifically, in its March 9, 2021 disposition order, the youth court ordered S.Z.O. to enter into a service agreement with CPS and ordered S.Z.O. to complete several specific tasks. In relevant part, S.Z.O. was ordered to (1) maintain stable housing; (2) maintain stable employment with verifiable income; (3) obtain reliable transportation with insurance; (4) "participate and cooperate with [I]n-Circle [and] attend and successfully complete classes in parenting through In-Circle"; (5) "undergo an assessment with the Family Intervention Program, if not accepted into [the family intervention program,] undergo a drug assessment and follow all recommendations, [and] submit to random drug screens as directed"; (6) "maintain visitation with [M.A.B.]"; and (7) maintain contact with CASA and CPS, including maintaining and providing a working telephone number. Testimony and documentary evidence presented at the TPR hearing show that S.Z.O. did not complete these requirements.

22

## 1.     Stable Housing

¶63.    S.Z.O. asserts that moving multiple times over two years does not support the youth court's finding that she was unstable.  We disagree.  Upon review, we observe that even S.Z.O. had difficulty explaining where she lived after M.A.B. was taken into custody, often confusing addresses, time periods, and the other family members who may also have been living in the various residences.  Despite her confusion, S.Z.O.'s testimony does show that she had moved residences several times in the approximately two years after M.A.B. was placed into custody, often living with other relatives.  S.Z.O. only lived independently for one five-to-six-month period.

¶64.    S.Z.O. was living with her mother, father, and E.K.B. when M.A.B. was rushed to the emergency room on January 9, 2021.  When S.Z.O.'s second child was born about ten months later, S.Z.O. moved in with her grandmother.  A few months later in December 2021, she moved into her own apartment on Jefferson Street where she resided for five to six months.  S.Z.O. then moved in with her father and sister (then later just her father) to a place on Prudie Circle in Gulfport, where she remained for six to seven months until one day before the TPR hearing.  Regarding S.Z.O.'s living situation at this point, however, both CPS representatives testified that S.Z.O. had been living between two residences in the last six to seven months.  Stacey testified that S.Z.O. told her on February 25, 2023 (just a little over a week before the TPR hearing), that she "stay[ed] three to four days a week at the . . . Prudie [Circle address], and then three or four days a week at the Elmira address [S.Z.O.'s grandmother's home]."  Castello corroborated this testimony.

23

¶65. Just a day before the hearing, S.Z.O. moved into a new apartment. She claimed that "[t]hey told me—what CPS said to me was your apartment is good enough for [her younger son], but it's not good enough for M.A.B. So I took that as they needed me to get a new house, so that's what I did." S.Z.O. did not identify anyone at CPS who would have told her this information. Stacey, who conducted a walkthrough for the Prudie residence with S.Z.O. on March 10, denies ever saying this to S.Z.O., or telling her to get a new place. On the contrary, Stacey testified that when she met with S.Z.O., she told S.Z.O. that her inconsistency, including her inability to "stay[] in one place" was one of her [(Stacey's)] "biggest concerns."

¶66. Castello testified about the agency's concerns over S.Z.O.'s stability and housing situation, as follows: "[S.Z.O.] has not been stable since we have had the case. She was stable for about four months a year ago when she was at the Jefferson [Street] . . . apartment. And she just hasn't been able to maintain it throughout the course of the case." In Castello's opinion, S.Z.O.'s instability was one of the agency's main concerns weighing against reunification.

¶67. We find that these circumstances, viewed as a whole, constitute credible proof that S.Z.O. failed to comply with the youth court's "stable housing" directive.

### 2. Stable Employment with a Verifiable Income

¶68. We likewise find that the record contains credible proof that S.Z.O. failed to maintain stable employment with a verifiable income. S.Z.O. asserts that she "maintained gainful employment" and had "adequate funds" to support M.A.B., but our own review of the record

shows otherwise. S.Z.O.'s testimony shows that although she worked at times during M.A.B.'s case, she did not hold a steady job. She said that she worked at the Shell station "[j]ust on and off" "for months," and before working at the gas station, she "worked at Waffle House, and I worked at several other jobs, but, you know." At the time of the TPR hearing, S.Z.O. had only been working as a home health aide for about two to three months. The record contains no wage or income information for any of these jobs except for one undated wage form purportedly from "Clark Oil Company" showing gross pay totaling $856.19, but no time period is indicated. We recognize that S.Z.O. testified that the day before the hearing she received a settlement check in the amount of $133,667.27, but there is no testimony or any other evidence of how these funds would be budgeted or used to support M.A.B. We find that credible proof supports a finding that S.Z.O. did not comply with the youth court's stable-employment-and-income directive.

### 3. Reliable Transportation

¶69. Credible proof also shows that S.Z.O. did not obtain "reliable transportation." S.Z.O. admitted that she did not obtain a vehicle. At one point in her testimony, S.Z.O. testified that her "sister pretty much takes [her] everywhere," but if her sister was working, then S.Z.O. would use public transportation. What we find more relevant, however, is S.Z.O.'s explanation for her dismissal from the family drug court program: "I ended up getting kicked out the program because I wasn't doing the meetings because I didn't have a car, you know." We find that these circumstances are credible proof that S.Z.O. did not meet the "reliable transportation" requirement.

25

#### 4.    In-Circle Participation

¶70.    The youth court ordered that S.Z.O. "participate and cooperate with In-Circle."  Two letters from the In-Circle Reunification Family Resource Coordinator (FRC) were admitted into evidence at the TPR hearing.  A letter dated August 25, 2021, from the In-Circle FRC to the CPS representative provides that "since March 15, 2021, . . . S.Z.O. . . . has been compliant with services and has met weekly with [her] [FRC] and Mental Health Therapist [(MHT)] to improve parenting skills and basic needs in the home."  S.Z.O. relies on this letter to assert that she was in compliance with the youth court's In-Circle directive.

¶71.    Just two weeks later, however, on September 9, 2021, the FRC sent a second letter to the CPS representative informing her that although S.Z.O. and E.K.B. *had been* compliant with In-Circle services, "[*the*] *caregivers became noncompliant with services on 8/30/21*." (Emphasis added).  Although this letter provides that S.Z.O. "received psychoeducation for skill building to achieve enhanced oversight and parenting skills"[9] during her participation in the program, we find no indication in the record that S.Z.O.'s obligation to continue participating in the In-Circle program had ended.  On the contrary, the record reflects that although S.Z.O. may have initially participated in the In-Circle program, she became noncompliant on August 30, 2021, despite the youth court's order and the requirement of her service plan.

¶72.    The youth court's next permanency order rendered on September 27, 2021, made no

---

[9] The record contains a certificate dated "7/28/22" providing that S.Z.O. completed the "Active Parenting Ages 1-4x Curriculum" through In-Circle/Canopy Children's Solutions.

modification to the In-Circle program requirement and explicitly provided "that all provisions of previous Orders not specifically modified herein shall remain in full force and effect." In short, we find that these circumstances constitute credible proof that S.Z.O. did not comply with the youth court's directive that she "participate and cooperate with [the] In-Circle [program]."

### 5.    Family Intervention Program Participation

¶73.    The youth court's March 9, 2021 disposition order required that S.Z.O. "undergo an assessment with the Family Intervention Program [and] . . . , if not accepted into [it], . . . undergo a drug assessment and follow all recommendations, [and] submit to random drug screens as directed." Although S.Z.O. was eventually accepted into the family intervention program, she then repeatedly failed to comply with subsequent orders issued during the course of her attempted participation in the program. She was ultimately dismissed from the family intervention program as "unsuccessful[] due to noncompliance with the Family Intervention Court Program requirements."

¶74.    To briefly summarize S.Z.O.'s lack of compliance, she was initially denied participation in the program because the drug court was unable to contact her. Subsequently, she was assessed and admitted to the family intervention program and was ordered by the youth court to continue with the program until she had successfully completed it. But at the next hearing, S.Z.O. was found noncompliant because she had failed to attend NA/AA meetings. S.Z.O. was ordered to continue with the program, but at the following hearing, she was found only "partially compliant" because she had missed therapy appointments and a

27

support meeting. Once again, the youth court ordered her to continue the program until she successfully completed it. At the next family-intervention-program hearing on January 20, 2022, the youth court found that S.Z.O. was noncompliant with the program and dismissed her from the program. The youth court specifically found that S.Z.O. was dismissed as "unsuccessful[]" because she failed to comply with the family intervention program's requirements.

¶75. We recognize Castello testified that two days before the TPR hearing, S.Z.O. provided CPS with a printout from Crossroads Recovery Center. Apparently, about a year before the TPR hearing, on May 22, 2022, S.Z.O. had received what Castello believed was an "SASSI assessment . . . [that] indicated that [S.Z.O.] didn't need treatment." The record contains no documentation of this May 22, 2022 assessment, nor does the record contain any information regarding any other recommendations that S.Z.O. may have received from Crossroads. More importantly, S.Z.O. tested positive for cocaine on March 23, 2023—just two weeks before the TPR hearing. Castello testified that she found this recent positive result for cocaine "concerning," particularly when coupled with S.Z.O.'s inability to successfully complete the family intervention program.

¶76. In this case, S.Z.O. tested positive for cocaine just two days after M.A.B.'s medical emergency concerning the infant's own cocaine exposure that led to M.A.B.'s removal from S.Z.O.'s home. S.Z.O. testified that she believed her January 11, 2021 positive test result was caused by her second-hand exposure to her mother's drug use. But S.Z.O. was unable to explain why she tested positive for cocaine on March 23, 2023. S.Z.O. was asked, "[W]ho

had you been around [(prior to that positive drug test)]?" S.Z.O. responded, "I don't hang around, you know, anyone," and she specifically denied being around her mother or E.K.B.[10]

¶77.   In short, S.Z.O. was repeatedly ordered by the youth court to successfully complete the family intervention program.  She failed to do so and was dismissed from the program as "unsuccessful[]."   Although S.Z.O. appeared to have obtained an assessment from Crossroads that she did not need treatment, she subsequently tested positive for cocaine just two weeks before the TPR hearing.  We find that this constitutes credible proof that S.Z.O. did not comply with the family-intervention-program directive in her service plan.

### 6.     Maintain Visitation with M.A.B.

¶78.   S.Z.O. testified that her visits with M.A.B. stopped in December 2022, several months prior to the TPR hearing.  She said that K.B. had been diagnosed with epilepsy, so much of her time was then spent "back and forth from the children's hospital" in Mobile.  According to S.Z.O., CPS contacted her for visitation, but she was at the children's hospital.  She said that "after [that], they never rescheduled me."  S.Z.O. admitted that since that time, she did not contact CPS to request visitation.  Castello likewise testified that no one contacted CPS to request visitation or to let CPS know that S.Z.O. was not having visitation with M.A.B.

¶79.   We recognize that S.Z.O. continued to try and talk to M.A.B. through FaceTime, but even S.Z.O. recognized this was not a workable solution.  In any event, the youth court's March 9, 2021 disposition order required S.Z.O. to "maintain visitation" with M.A.B.  S.Z.O. did not "maintain visitation" with M.A.B., and even S.Z.O. understands that FaceTime with

---

[10] S.Z.O. had her own drug screen taken on March 31, 2023, and the result was negative.

29

a toddler is not a sufficient substitute. There is no evidence in the record regarding any attempt on S.Z.O.'s part to remedy the situation. We find that these circumstances are credible proof that S.Z.O. did not comply with the youth court's visitation directive.

### 7. Maintain Contact with CPS

¶80. The testimony discussed above shows that S.Z.O. failed to maintain adequate contact with CPS. Further, Stacey testified that S.Z.O. did not have a current phone number listed with CPS when she (Stacey) took over M.A.B.'s case. Stacey had to use a social media messenger to reach her. As such, S.Z.O. also failed to provide and maintain a working telephone number as required by the March 9, 2021 disposition order.

### C. Summary regarding Section 93-15-119(1)(a)(i) and (ii)

¶81. Based upon the credible proof we have discussed above, we find no error in the youth court's finding that there was clear and convincing evidence to terminate S.Z.O.'s parental rights pursuant to section 93-15-115 and section 93-15-119(1)(a)(i)-(ii). Namely, (1) M.A.B. had been adjudicated as neglected, (2) she had been in the care of CPS for at least six months and had a reunification service plan, (3) the youth court had previously conducted a permanency hearing and found that CPS had made reasonable efforts at reunification but S.Z.O. had failed to substantially comply with the service plan, and (4) reunification was not desirable toward obtaining a satisfactory outcome based on section 93-15-119(1)(a)(i)-(ii).

¶82. We likewise find that credible proof supports the youth court's findings of fact by clear and convincing evidence that S.Z.O. was "unfit to raise [M.A.B.]" when M.A.B. tested positive for cocaine at four months old, S.Z.O. allowed M.A.B. to live with known drug

30

users, and S.Z.O. herself tested positive for illegal drugs on multiple occasions. Further, as we have detailed above, credible proof also shows that S.Z.O. failed to substantially comply with numerous requirements of her reunification service plan and court orders. In short, we find credible proof based on these circumstances that clear and convincing evidence supports the youth court's finding that reunification was not desirable toward obtaining a satisfactory outcome. Accordingly, we affirm the youth court's decision here.

### III.   Sections 93-15-121(e) and 93-15-121(f)

¶83.   As we have noted, "[o]nly one statutory ground is necessary to justify TPR." *R.B.*, 291 So. 3d at 1122 (¶17). In this case, however, we also find that credible proof supports the youth court's finding that clear and convincing evidence establishes grounds for terminating S.Z.O.'s parental rights pursuant to sections 93-15-121(e)-(f). As such, we also address these factors.[11]

¶84.   In relevant part, section 93-15-121 authorizes a court to terminate a parent's parental rights where clear and convincing evidence is presented at an evidentiary hearing showing that "(e) [t]he parent has failed to exercise reasonable visitation or communication with the child"; or "(f) [t]he parent's . . . neglectful conduct has caused, at least in part, an extreme

---

[11] We recognize the youth court also concluded that section 93-15-121(c) was an independent ground for termination of S.Z.O.'s parental rights, which requires clear and convincing proof that a "parent is suffering from habitual alcoholism or other drug addiction and has failed to successfully complete alcohol or drug treatment." As noted, however, the law requires only one ground for TPR pursuant to section 93-15-119 *or* 93-15-121 to support termination. In this case, as detailed above, we find that there are other strong grounds pursuant to sections 93-15-119(1)(a)(i)-(ii), 93-15-121(e), and 93-15-121(f) supporting the termination of S.Z.O.'s parental rights. We therefore find no need to discuss section 93-15-121(c) and decline to do so.

31

and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child." Miss. Code Ann. § 93-15-121(e)-(f).

¶85. We find that the record contains credible proof that clear and convincing evidence supports the youth court's finding that S.Z.O. "failed to exercise reasonable visitation or communication with [M.A.B.]" and that S.Z.O.'s neglectful conduct "caused, at least in part, . . . a substantial erosion the relationship between [S.Z.O.] and [M.A.B.]." We find that these two factors are best discussed together under the circumstances of this case.

¶86. As an initial matter, it was S.Z.O.'s neglectful conduct in allowing her infant daughter to live in a home where drug use was prevalent, causing M.A.B. to test positive for cocaine when she was four months old, which led to M.A.B. being adjudicated a neglected child and taken into CPS custody. Indeed, although S.Z.O. initially denied the allegations in the petition to have M.A.B. adjudicated as a "neglected child," she later changed her denial to a plea of no contest.

¶87. M.A.B. was placed in foster care at four months of age and had been living with her foster parents for approximately two years and three months at the time of the TPR hearing. As the GAL reported, M.A.B. has bonded with her foster parents, as well as her foster grandparents, and is "clearly well-loved, happy[,] and content in her foster home."

¶88. In contrast, S.Z.O. ceased visitation with M.A.B. in December 2022, when M.A.B. was just a little over two years old. S.Z.O. never contacted CPS to request visitation since that time. Castello testified that S.Z.O.'s lack of visitation with M.A.B. had affected their relationship, and Castello agreed that S.Z.O.'s conduct rose to the level of causing an erosion

of that relationship. S.Z.O.'s sister J.O. likewise testified that she did not believe there was a bond between S.Z.O. and M.A.B.

¶89. Testimony presented at the hearing also establishes that S.Z.O.'s lack of meaningful contact with M.A.B. is especially damaging, given that M.A.B. was only four months old when she was placed in foster care. S.Z.O. argues that after her visitation with M.A.B. ceased, S.Z.O. maintained contact with M.A.B. through FaceTime phone conversations. But even S.Z.O. admitted that this was not a workable arrangement with a two-year-old because of the difficulty in getting M.A.B. to engage with her over the phone. As S.Z.O. admitted at the hearing, "sometimes [M.A.B.] doesn't want to talk, so—and they don't make her talk, because, you know, she's just two. No one can make a two-year-old sit and talk, so—."

¶90. S.Z.O.'s sister testified that there was no bond between M.A.B. and S.Z.O., mainly due to their communication being limited to FaceTime. As J.O. testified, "You're putting a child in a room with someone she only talks to on the phone, so it's hard for you to create that bond . . . . [S.Z.O. is] trying to interact with her child, but her child is interested in other things. And that's only natural considering they don't spend a lot of time together." This testimony shows that in light of M.A.B.'s young age, "reasonable" visitation or communication necessarily requires in-person contact with the child.

¶91. In sum, we find that credible proof supports the youth court's finding that clear and convincing evidence of S.Z.O.'s failure to maintain "reasonable visitation or communication" with M.A.B. (as opposed to mere FaceTime calls with her two-year-old child) supports termination of S.Z.O.'s parental rights pursuant to section 93-15-121(e). Likewise, based on

33

the testimony and evidence described above, we find that credible proof supports the youth court's finding that there was clear and convincing evidence to terminate S.Z.O.'s parental rights pursuant to section 93-15-121(f). *See In re B.A.H.*, 225 So. 3d 1220, 1242 (¶68) (Miss. Ct. App. 2016) (finding sufficient proof supported TPR due to "substantial erosion of the relationship" between mother and children in foster care at "only twenty months and six weeks old, respectively," and showing children developed close bonds with foster parents and siblings with "no observable bond" between mother and children).

### IV. M.A.B.'s Best Interest

¶92. "Even where one of the grounds for termination is proved by clear and convincing evidence, the trial court must still consider whether termination is in the best interest of the child." *Bullock*, 343 So. 3d at 1086 (¶22) (internal quotation marks omitted). We find that the credible evidence discussed above likewise supports the youth court's conclusion that termination of S.Z.O.'s parental rights is in M.A.B.'s best interest.

¶93. M.A.B. was taken into custody by CPS because S.Z.O. allowed her to be exposed to conditions that caused the infant to test positive for cocaine at four months of age. After M.A.B. was placed into CPS custody, S.Z.O. failed to comply with her service plans and youth court orders in numerous ways. S.Z.O.'s own conduct led, at least in part, to the erosion of her relationship with M.A.B.

¶94. In contrast, M.A.B. has lived with her foster parents since she was four months old and is thriving in their care. As the GAL reported, "M.A.B. . . . has likely grown out of both of her heart murmurs, according to careful and regular monitoring," her foster parents have

had her "evaluated for speech therapy," and M.A.B. has recently had her first appointment with First Steps (a program for developmentally delayed children). M.A.B. "does very well in daycare and loves her teacher." M.A.B.'s foster father works as a "data analyst at the Veterans Administration in Biloxi, involved in behavioral health programs," and her foster mother is "a stay-at-home parent for her eighteen-year-old . . . son and another foster child who was very recently placed in the home. . . . The foster mother's parents and her brother live in the same neighborhood in Biloxi."

¶95. Describing M.A.B.'s demeanor, the GAL reports that "[M.A.B.] enjoys the trampoline in the back yard. She is friendly and affectionate, and she loves children. [M.A.B.] is outgoing and self-assured. She is clearly well-loved, happy and content in her foster home." M.A.B. has plainly bonded with her foster parents and grandparents. In short, we find that credible proof supports the youth court's finding by clear and convincing evidence that the termination of S.Z.O.'s parental rights and adoption were in M.A.B.'s best interests.

## CONCLUSION

¶96. For all the reasons addressed above, we find that credible proof supports the youth court's judgment terminating S.Z.O.'s parental rights based on clear and convincing evidence. Accordingly, we affirm.

¶97. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, McCARTY, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**